UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THERON DANIELS,

                Plaintiff,

v.

                                          Case No. 3:17-cv-1239-J-34JRK

DENNIS A. VILCHEZ, M.D.,
et al.,

                Defendants.

_____

**<u>ORDER</u>**

**I. Status**

Plaintiff Theron Daniels, an inmate of the Florida penal system, initiated this action on November 3, 2017, by filing a pro se Civil Rights Complaint (Complaint; Doc. 1). In the Complaint, Daniels asserts claims pursuant to 42 U.S.C. § 1983 against the following Defendants: (1) Dennis A. Vilchez, M.D.; (2) Alexis Figueroa, M.D.; (3) B. Celian, M.D.[1]; (4) Luis Vazquez, M.D.; and (5) Centurion of Florida, LLC (Centurion). He asserts that Defendants violated his Eighth Amendment right when they were deliberately indifferent to his serious medical needs. As relief, he seeks monetary damages.

This matter is before the Court on Defendants Centurion, Vilchez, Vazquez, and Figueroa's Motion for Summary Judgment (Motion; Doc. 73). They submitted exhibits in

_____

[1] The Court dismissed Daniels' claims against B. Celian on August 15, 2019. <u>See</u> Order (Doc. 42).

support of the Motion. <u>See</u> Def. Ex., Doc. 73-1.[2] The Court advised Daniels of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the motion. <u>See</u> Order (Doc. 5); Summary Judgment Notice (Doc. 74). Daniels filed a response in opposition to the Motion, <u>see</u> Objections to Defendants' Motion for Summary Judgment Due to Remaining Issues of Material Fact in Dispute (Response; Doc. 75) with an exhibit (Doc. 75-1), and Defendants filed a Reply (Doc. 78). Defendants' Motion is ripe for review.

## II. Plaintiff's Allegations[3]

In his verified Complaint,[4] Daniels asserts that he was involved in a physical altercation at Suwannee Correctional Institution (SCI) in Live Oak, Florida, on July 19, 2016. <u>See</u> Complaint at 4. According to Daniels, x-rays following the altercation showed a broken knuckle on his left hand. <u>See</u> <u>id.</u> He states that SCI medical staff gave him two Lortab pain pills at the initial evaluation, and placed a splint on his hand. <u>See</u> <u>id.</u> He

---

[2] The Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

[3] The recited facts are drawn from the Complaint, and because this matter is before the Court on a summary judgment motion filed by Defendants Centurion, Vilchez, Vazquez, and Figueroa, the Court's recitation of the facts will focus on Daniels' allegations as to them.

[4] <u>See</u> <u>Stallworth v. Tyson</u>, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

maintains that Defendant Vazquez prescribed Lortab, however, the SCI medical staff never filled the prescription. <u>See</u> <u>id.</u> He also states that he was not provided any pain medication until a nurse gave him some non-aspirin on August 2, 2016. <u>See</u> <u>id.</u>

According to Daniels, Dr. Ong performed surgery on his left pinky finger at the Reception and Medical Center (RMC) in Lake Butler, Florida, on August 11, 2016, and provided post-surgical instructions. <u>See</u> <u>id.</u> Daniels summarizes Dr. Ong's follow-up-care instruction as follows: (1) removal of stitches in two weeks; (2) removal of pins after eight weeks; and (3) provision of prescribed pain medication (Lortab and Excedrin), and other medications (Keflex 500 mg, Benadryl, and Oyster Shell calcium). <u>See</u> <u>id.</u> He asserts that the Florida Department of Corrections (FDOC) transferred him back to SCI after the surgery. <u>See</u> <u>id.</u>

Daniels states that, upon his return to SCI, Defendant Figueroa advised him that he would prescribe Ibuprofen. <u>See</u> <u>id.</u> He maintains that he explained to Figueroa that he was allergic to non-steroidal anti-inflammatory drugs (NSAIDs), and Figueroa told him to shut his mouth or he would have him locked up. <u>See</u> <u>id.</u> According to Daniels, he did not receive any pain medication from August 11th until August 25th. <u>See</u> <u>id.</u> Daniels avers that when he complained about the lack of pain medication on August 25th, the SCI medical staff advised him to take the Ibuprofen that Figueroa ordered. <u>See</u> <u>id.</u> at 5.

Daniels avers that he declared a medical emergency on August 29th because his hand was "swollen and discolored." <u>Id.</u> He states that Vazquez cleaned his hand and prescribed Lortab for four days. <u>See</u> <u>id.</u> He asserts that he declared another medical emergency on September 9th because he was still in a "great deal of pain and his hand

3

was swollen." Id. Daniels declares that he showed the medical staff "blood, pus, and yellow looking fluid coming from his hand." Id. According to Daniels, the medical staff changed the dressing, and gave him several packets of non-aspirin for pain, and advised him that "nothing was wrong with his hand." Id. He avers that blood, pus and yellow fluid was still seeping from his wound on September 13th, when the medical staff changed the dressing. See id.

Daniels states that SCI security staff refused to permit him to go to his September 19th doctor visit, so he declared a medical emergency. See id. According to Daniels, Dr. Celian confirmed that his hand was infected, and treated him with antibiotics, an ice pack, three packages of Tylenol, and an arm sling. See id. He avers that he declared a medical emergency on October 3rd because "flesh had grown around the stitches." Id. He states that he was told to request a sick-call visit. See id. Daniels maintains that he continued to visit sick call, at which he complained about the "constant pain" caused by the stitches. Id. He declares that the medical staff neither provided pain medication nor removed the stitches, but instead told him there was nothing they could do for him. See id.

According to Daniels, he showed Defendant Vilchez his hand and informed Vilchez about Dr. Ong's post-surgical instructions. See id. Daniels proclaims that Vilchez told him that there was nothing he could do because the surgeon needed to remove the stitches. See id. According to Daniels, Centurion either was aware, or should have been aware, of its employees' actions, and failed to take any action to prevent or remedy Daniels' suffering. See id. at 6. He maintains that Centurion established a custom where the employees performed only routine health care and withheld costly treatments. See id.

4

Daniels avers that the stitches were removed in "a second surgery to dig the stitches out of [his] hand as [his] flesh had grown around and over the stitches." <u>Id.</u> at 5. He states that he complained about the pain to Vilchez, who said, "you silly inmate, your hand is infected[;] that's why you have pain in your hand." <u>Id.</u> at 6. He avers that his left hand will not "close," and he has lost the use of his left hand due to Defendants' deliberate indifference to his medical needs. <u>Id.</u>

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rules(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). [5] An issue is

---

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

<u>Id.</u> "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." <u>Campbell v. Shinseki</u>, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a

6

reasonable jury could return a verdict for the nonmoving party." <u>Guevara v. NCL</u> <u>(Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

In the Motion, Defendants assert that there are no genuine issues of material fact, and therefore, the Court should grant summary judgment in their favor as to Daniels' Eighth Amendment claims against them. <u>See</u> Motion at 14-22. In his Response, Daniels maintains that Defendants are not entitled to summary judgment in their favor because there remain genuine issues of material fact as to his Eighth Amendment claims against them. <u>See</u> Response at 1-4. He requests that the Court either deny Defendants' Motion, or in the alternative, grant him sixty days to file "a more comprehensive objection" to Defendants' Motion with exhibits and affidavits. Additionally, Daniels asks that the Court enter summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56(f).[6] <u>Id.</u> at 5.

## V. Eighth Amendment Deliberate Indifference

The Eleventh Circuit has explained the requirements for a claim of constitutionally inadequate care:

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." <u>Farmer</u>, 511 U.S. at 832, 114 S.Ct. at 1976 (internal quotation and citation omitted).[7] Thus, in its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that

---

[6] Federal Rule of Civil Procedure 56(f)(1) gives the Court the discretion to "grant summary judgment for a nonmovant" after providing notice to the opposing party.

[7] <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

7

> prison officials provide humane conditions of confinement. Id.
> However, as noted above, only those conditions which
> objectively amount to an "extreme deprivation" violating
> contemporary standards of decency are subject to Eighth
> Amendment scrutiny. Hudson, 503 U.S. at 8-9, 112 S.Ct. at
> 1000.[8] Furthermore, it is only a prison official's subjective
> deliberate indifference to the substantial risk of serious harm
> caused by such conditions that gives rise to an Eighth
> Amendment violation. Farmer, 511 U.S. at 828, 114 S.Ct. at
> 1974 (quotation and citation omitted); Wilson, 501 U.S. at 303,
> 111 S.Ct. at 2327.[9]

Thomas v. Bryant, 614 F.3d 1288, 1306-07 (11th Cir. 2010). "A prisoner bringing a deliberate-indifference claim has a steep hill to climb." Keohane v. Fla. Dept. of Corr. Sec'y, 952 F.3d 1257, 1266 (11th Cir. 2020). "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)). First, the plaintiff must satisfy the objective component by showing that he had a serious medical need. Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007).

> "A serious medical need is considered 'one that has
> been diagnosed by a physician as mandating treatment or
> one that is so obvious that even a lay person would easily
> recognize the necessity for a doctor's attention.'" Id. [10] (citing
> Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th
> Cir. 1994)). In either case, "the medical need must be one
> that, if left unattended, pos[es] a substantial risk of serious
> harm." Id. (citation and internal quotations marks omitted).

---

8 Hudson v. McMillian, 503 U.S. 1 (1992).

9 Wilson v. Seiter, 501 U.S. 294 (1991).

10 Farrow, 320 F.3d at 1243.

8

Brown, 387 F.3d at 1351. Next, the plaintiff must satisfy the subjective component, which requires the plaintiff to "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (describing the three components of deliberate indifference as "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.") (citing Farrow, 320 F.3d at 1245); Lane v. Philbin, 835 F.3d 1302, 1308 (11th Cir. 2016) (setting forth the three components) (citing Farrow, 320 F.3d at 1245).

> [T]he Supreme Court established that "deliberate indifference" entails more than mere negligence. Estelle,[11] 429 U.S. at 106, 97 S.Ct. 285; Farmer, 511 U.S. at 835, 114 S.Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, [12] 182 F.3d at 1255; Taylor,[13] 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

---

[11] Estelle v. Gamble, 429 U.S. 97 (1976).

[12] McElligott v. Foley, 182 F.3d 1248 (11th Cir. 1999).

[13] Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000).

<u>Farrow</u>, 320 F.3d at 1245-46. Notably, the Supreme Court has stated that a plaintiff may demonstrate the deliberate indifference of prison officials by showing that they intentionally interfered with prescribed treatment or intentionally denied access to medical care. <u>See</u> <u>Estelle</u>, 429 U.S. at 104-05.

## VI. Analysis[14]

Daniels asserts that Defendants Centurion, Vilchez, Vazquez, and Figueroa violated his Eighth Amendment right when they were deliberately indifferent to his serious medical needs. Defendants maintain that they are entitled to summary judgment as to Daniels' Eighth Amendment deliberate indifference claims against them. Pursuant to 28 U.S.C. § 1746,[15] Defendants submitted a declaration in support of their summary judgment request. <u>See</u> Doc. 73-1 at 1-13, Declaration of John P. Lay, Jr., M.D. (Lay Decl.). Dr. Lay states in pertinent part:

> I am a medical doctor, and I am employed by Centurion of Florida, LLC ("Centurion"), as its Statewide Medical Director.
>
> Centurion is a private company which contracts with the Florida Department of Corrections to provide healthcare services to inmates in the State of Florida.
>
> My duties as the Statewide Medical Director include overseeing and approving medical treatment for inmates.

---

[14] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to Daniels. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

[15] A declaration under § 1746 includes the following affirmation: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746(2).

I have personal knowledge of the facts contained in this Declaration due to my review of the medical records of inmate Theron Daniels, DC#068947 (the "Plaintiff").

These medical records are … kept in the course of Centurion's regularly conducted activity and it is the regular practice of Centurion to make or keep such records. A true and correct copy of the medical records which are relevant to the issues raised in this lawsuit are attached hereto as "Composite Exhibit 1."[16]

All facts stated in this Declaration are true and correct.

Plaintiff has been intermittently incarcerated in the Florida prison system since 1979 for different periods of time and different offenses. Plaintiff's current incarceration period started in 2012, and is scheduled to continue until Plaintiff's current release date of February 20, 2024.

The records show that Plaintiff intermittently refused medical care and treatment. The records also show that, despite these issues, Centurion and its medical providers, including but not limited to Dr. Figueroa, Dr. Vilchez, and Dr. Vazquez, provided adequate care to the Plaintiff. The treatment provided was the treatment that Centurion and its medical providers, including but not limited to Dr. Figueroa, Dr. Vilchez and Dr. Vazquez, concluded was clinically warranted based on their expertise, knowledge and training.

At the outset, correctional institution physicians must be conservative and careful in the prescription of narcotics to inmates because of the dangers inherent and present in the prison system, including but not limited to, malingering of symptoms to obtain narcotics without having a medical necessity; addiction dangers; and usage of the narcotics as bartering tools within the prison system.

It should also be noted that it is the inmate's responsibility to present to the medication pick-up window in order to receive prescribed narcotics such as Lortab.

---

16 See Doc. 73-1 at 14-112.

11

Finally, it should be noted that over-the-counter pain medication is available to inmates at their dormitory upon the inmates' request and without the need for a prescription by a physician.

. . . .

The records show that for the times relevant to this lawsuit, and when Plaintiff's treating providers deemed appropriate based on their training, knowledge and expertise, Plaintiff was prescribed and received pain medication in several forms including but not limited to, Lortab, Excedrin, Acetaminophen, ASA and Tylenol. True and correct copies of the medical records showing pain medications prescribed and dispensed to the Plaintiff for the periods of time relevant to the present lawsuit are attached hereto as "Composite Exhibit 2."[17]

. . . .

Unfortunately, despite more than adequate treatment provided to the Plaintiff by Centurion and its providers, Plaintiff developed arthritis to his left pinky finger. There was nothing that could have been done by way of medical treatment which could have prevented Plaintiff from having developed this condition under the circumstances.

The medical records attached hereto as "Composite Exhibit 1" and "Composite Exhibit 2" show that Plaintiff received adequate and appropriate medical care and treatment for the condition to his left 5th finger – i.e., the "pinky finger." This treatment included pain medications in several different forms, two surgeries – the first in the form of ORIF (open reduction and internal fixation), and the second in the form of arthroplasty. In between the two surgeries and also after the arthroplasty surgery, Plaintiff underwent a substantial regimen of physical therapy to his left pinky finger/left hand. Plaintiff also underwent numerous diagnostic tests in the form of x-rays of his left hand and fingers.

Also . . ., Plaintiff consulted on numerous occasions for treatment, diagnosis, surgeries and follow-up consultations with different physicians, including but not limited to, specialist

---

[17] See Doc. 73-1 at 113-45.

> Plastic Surgeon Dr. Ong. The substantial amount of treatment and care provided by Plaintiff's treating providers, including but not limited to, Dr. Figueroa, Dr. Vazquez, and Dr. Vilchez, and also provided by Centurion, show a complete lack of any actions or omissions which could support allegations that Centurion, Dr. Figueroa, Dr. Vazquez or Dr. Vilchez intentionally or deliberately denied any treatment to the Plaintiff.
>
> All of the medical records I reviewed for the Plaintiff show that Centurion and its providers, Dr. Figueroa, Dr. Vazquez and Dr. Vilchez provided the best care and treatment they deemed appropriate and necessary for the Plaintiff pursuant to these providers' knowledge, expertise, training and experience.

Lay Decl. at 1-3, 9, 12 (enumeration omitted).

In opposing Defendants' Motion, Daniels asserts that genuine issues of material fact remain, thus precluding the entry of summary judgment in Defendants' favor. In his Response, he includes a "non-exhaustive list of misleading factual representations" that prevents the entry of summary judgment in Defendants' favor. Response at 1-4. Additionally, Daniels submitted an exhibit relating to post-surgery instructions. See Doc. 75-1 at 2. In a Reply, Defendants argue that Daniels' assertions are "unsupported by any evidence" and maintain that the Court should enter summary judgment in their favor. Reply at 1.

The chronology of events on which Daniels bases his Eighth Amendment deliberate indifference claims against Defendants Centurion, Vilchez, Vazquez, and Figueroa is as follows. On July 19, 2016, Daniels was involved in a physical altercation with another inmate. See Complaint at 4; Doc. 73-1 at 14; Lay Decl. at 3. That same day, he was admitted to the institution's emergency room (ER) where Defendant Vazquez

treated his swollen left pinky finger. <u>See</u> Doc. 73-1 at 14-16; Lay Decl. at 3-4. According

to the ER record, Daniels had no signs of "distress," and Vazquez ordered x-rays, digit

immobilization, and a follow-up medical consultation. Doc. 73-1 at 14, 16; <u>see</u> Lay Decl.

at 4. The medical staff gave Daniels two Lortab pain pills that day, and Vazquez

prescribed Lortab, however, the medical staff never filled the prescription. <u>See</u> Complaint

at 4. In a declaration, Dr. Lay states in pertinent part:

> [Daniels'] allegation is contradicted by the medical records,
> which show that Plaintiff was prescribed Lortab for 2 days on
> July 19,[18] and in fact received Lortab on July 19 and July 21,
> 2016.[19] According to the records, Plaintiff did not receive
> Lortab on July 20, 2016, because he failed to present to the
> medication pick-up window in order to receive the Lortab. . . .
> [I]t is the inmate's responsibility to present to the medication
> pick-up window in order to receive prescribed narcotics such
> as Lortab.
>
> There are no records showing that Plaintiff requested
> any pain medication after the last dose of Lortab Plaintiff
> received on July 21, 2016. This could be because Plaintiff did
> not need more Lortab and therefore did not request more of
> the medication. This could also be because Plaintiff received
> over-the-counter pain medication at his dormitory. . . . [O]ver-
> the-counter pain medication is available to inmates at their
> dormitory upon the inmates' request and without the need for
> a prescription by a physician.

Lay Decl. at 3, ¶¶ 14-15. In his Response, Daniels states that he was not able to go to

the pick-up window on July 20th to receive the Lortab because he was in close

management (CM). <u>See</u> Response at 2. He maintains that Nurse Crider, the duty nurse

---

[18] <u>See</u> Doc. 73-1 at 113.

[19] <u>See</u> Doc. 73-1 at 114.

14

that day, delivered medications to other CM inmates, however, she failed to deliver Lortab to Daniels. See id.

On July 19th, the SCI medical staff took x-rays of Daniels' left hand, as Vazquez ordered. See Doc. 73-1 at 17; Lay Decl. at 4. Dr. Nadir Khan found as follows:

> There is an acute displaced and angulated fracture involving the distal aspect of the 5th metacarpal bone [(pinky finger)] relating to a boxer's type fracture. Adjacent soft tissue swelling is present.

Doc. 73-1 at 17. That same day, Vazquez requested that a medical specialist evaluate Daniels' hand. See Doc. 73-1 at 18; Lay Decl. at 4. The request was approved, and the appointment was scheduled for August 10, 2016. See id. A nurse gave Daniels non-aspirin at sick call on August 2, 2016. See Complaint at 4. The next day, Daniels either refused treatment at sick call, see Doc. 73-1 at 19; Lay Decl. at 4, or was not able to appear because, as a CM inmate, he depended on the security and medical staff to take him to sick call, see Response at 2.

On August 10th, Dr. Ong, a plastic surgeon, examined Daniels and ordered additional diagnostic testing. See Doc. 73-1 at 20-21; Lay Decl. at 4. That same day, the RMC medical staff took x-rays of Daniels' left hand. See Doc. 73-1 at 22; Lay Decl. at 4-5. Dr. Robin Connolly reported the following findings:

> There is evidence of a boxer[']s fracture in the 5th metacarpal neck. Soft tissue swelling and volar displacement is identified. Remainder [of] the hand is within normal limits.
>
> IMPRESSION:
> Acute 5th metacarpal necks comminuted fracture with displacement.

15

Doc. 73-1 at 22. Based on Dr. Connolly's findings, staff admitted Daniels to RMC for surgery "in the form of open reduction and internal fixation ("ORIF"), which is a type of surgery used to fix broken bones[.]" Lay Decl. at 5.

Dr. Ong performed surgery on Daniels' left pinky finger on August 11th. See Complaint at 4; Doc. 73-1 at 25. After the surgery, the medical staff applied a dressing and hand-wrist splint. See Doc. 73-1 at 25; Lay Decl. at 5. Dr. Ong ordered a follow-up consultation to remove sutures in two weeks, and Vazquez reviewed Ong's report and recommendations on August 17th. See Doc. 73-1 at 26; Lay Decl. at 5. According to Dr. Lay, "there were no other post-surgery recommendations by Dr. Ong." Lay Decl. at 5. An August 11, 2016 Physician's Order Sheet listed Keflex, Lortab, Excedrin, Benadryl, and Oyster Shell calcium. See Doc. 75-1 at 2; Complaint at 4. Upon Daniels' return to SCI, Defendant Figueroa discontinued Lortab and prescribed Ibuprofen on August 12th. See id.

According to the FDOC Medication and Treatment Record, Daniels was prescribed Ibuprofen for ten days, and received it from August 14th through 17th, when he refused the pain medication, stating he was allergic to NSAIDs. See Doc. 73-1 at 115; Lay Decl. at 5; Complaint at 4. The medical records show that he is allergic to NSAID drugs. See Doc. 73-1 at 115-17. Daniels asked for pain medication at sick call on August 25th, and the medical staff advised him to take the Ibuprofen that Figueroa had ordered. See Complaint at 5.

Daniels declared a medical emergency on August 29th, at which Vazquez cleaned his hand and prescribed Lortab for four days. See id. Daniels received Lortab from August

29th through September 2nd. See Doc. 73-1 at 116-17; Lay Decl. at 5. He refused sick-call treatment on August 30th because he had already seen Vazquez the day before. See Response at 3; Doc. 73-1 at 27. On September 9th and 13th, the medical staff changed the dressing, and gave him packets of non-aspirin for pain. See Complaint at 5; see also Doc. 73-1 at 119.

On September 19th, Daniels was examined for left-hand swelling and "complications" from the August 11th surgery. Doc. 73-1 at 28. He was prescribed medications, including Tylenol on an as-needed basis from September 20th through 27th, and received wound care. See Doc. 73-1 at 118; Lay Decl. at 6. On September 27th, the medical staff took additional x-rays of his left hand, which revealed "ORIF [open reduction and internal fixation)] in the 5th metacarpal as described in good condition." Doc. 73-1 at 29; Lay Decl. at 6.

On October 3, 2016, Vilchez removed ten stitches from Daniels' left hand, and noted that the pins were infected. See Doc. 73-1 at 30; Lay Decl. at 6. He prescribed antibiotics (Doxycycline for fourteen days and Clindamycin for ten days), and ordered calcium, daily wound care for two weeks, and a follow-up appointment in ten days. See id. Dr. Ong saw Daniels on October 5th, when he noted that sutures had been removed on October 3rd at the facility and that Daniels was not wearing his splint. See Doc. 73-1 at 32. Ong recommended a follow-up appointment in two weeks. See id. On October 24th, Daniels saw Vilchez, who noted that a plastic surgery consultation for Daniels had already been requested. See Doc. 73-1 at 33; Lay Decl. at 6. On November 3rd, Dr. Ong examined Daniels and prescribed pain medication (Acetaminophen) for sixty days. See

Doc. 73-1 at 35, 124; Lay Decl. at 6. On November 17th, Vilchez ordered x-rays with three

views of Daniels' hand. See Doc. 73-1 at 36; Lay Decl. at 6. The SCI medical staff took

the x-rays on November 22nd, and Dr. Sean Johnston reported the following findings:

> The previously placed pins within the fifth metacarpal have
> been removed in the interval. Healed fracture involving the
> fifth metacarpal is seen. Osteoarthritic changes are seen
> within the fourth and fifth distal interphalangeal joints and
> within the fifth proximal interphalangeal joints. Bone
> mineralization is within normal limits. There is no evidence of
> joint effusion. No radio-opaque foreign bodies noted on this
> examination.
>
> IMPRESSION:
> Status post pin removal fifth metacarpal fracture, healed.
> Osteoarthritic changes as described above.

Doc. 73-1 at 37. Daniels was approved for physical therapy on December 2nd. See id. at

40; Lay Decl. at 6. He started a regimen of physical therapy with John Palmer, a physical

therapist, on December 16th. See Doc. 73-1 at 41-42; Lay Decl. at 6. That same day,

Vilchez examined Daniels, noted that there was improved grip and flexion on the fifth

finger, and recommended a follow-up consultation after Daniels completed the physical

therapy. See Doc. 73-1 at 43; Lay Decl. at 6. On December 20th, Vilchez approved a

physical-therapy request. See Doc. 73-1 at 44; Lay Decl. at 7. Vilchez consulted with

Daniels on January 23, 2017. See Doc. 73-1 at 45; Lay Decl. at 7. Daniels had physical

therapy on his hand twice a week from February 6th through 15th. See Doc. 73-1 at 46-

48; Lay Decl. at 7. On February 20th, Daniels was examined due to swelling in his left

hand. See Doc. 73-1 at 48-49; Lay Decl. at 7. The records show that Daniels was taking

Acetylsalicylic acid, a pain reliever, and that the hand had not improved after the physical-

therapy regimen. See Lay Decl. at 7. Vilchez recommended that Daniels see the plastic

18

surgeon, and an appointment was scheduled for February 22nd. <u>See</u> Doc. 73-1 at 51; Lay Decl. at 7.

On February 22, 2017, Dr. Ong consulted with Daniels, and recommended arthroplasty surgery on Daniels' left fifth finger. <u>See</u> Doc. 73-1 at 52-53; Lay Decl. at 7. Vilchez reviewed the recommendation, and initiated the approval process for surgery. <u>See</u> Doc. 73-1 at 54; Lay Decl. at 7. The next day on February 23rd, Vilchez examined Daniels and noted that the surgery request had been submitted for approval the previous day. <u>See</u> Doc. 73-1 at 56; Lay Decl. at 7.

On May 16th, the FDOC transferred Daniels to RMC for hand surgery. <u>See</u> Doc. 73-1 at 57-58; Lay Decl. at 7. The Health Transfer/Arrival Summary states that Daniels was taking pain medication. <u>See</u> Doc. 73-1 at 57; Lay Decl. at 7. Dr. Ong performed arthroplasty surgery on Daniels' left fifth finger on May 25th. <u>See</u> Doc. 73-1 at 60; Lay Decl. at 7. After surgery, Daniels' hand was placed in a splint, and Ong prescribed antibiotics (Keflex), pain medication (Lortab) for seven days, and Excedrin for thirty days. <u>See</u> Doc. 73-1 at 60, 66, 72; Lay Decl. at 7. The medical staff removed the sutures on or about Friday, June 16th. <u>See</u> Doc. 73-1 at 74. On June 18th, the medical staff saw Daniels in Urgent Care due to pain in his left pinky finger as a result of the removal of sutures, and referred him to a physician for an evaluation. <u>See</u> Doc. 73-1 at 74; Lay Decl. at 8. A few days later on June 21st, Dr. Ong consulted with Daniels about the hand pain, prescribed Excedrin and Keflex, and recommended additional physical therapy. <u>See</u> Doc. 73-1 at 74; Lay Decl. at 8. On July 7th, RMC medical staff took an x-ray of Daniels' left hand, specifically to evaluate for "loose hardware." <u>See</u> Doc. 73-1 at 77-78; Lay Decl. at

19

8. That same day, Dr. Stephen Veigh made the following findings:

> **FINGERS LT 3V** [(three views)]:
> Comparison 2/22/17.
> Interval identification of resection PIP [(proximal interphalangeal)] fifth digit. There is soft tissue swelling. There are a few small densities identified within the joint space region. There is a band of lucency distal aspect proximal phalanx just prior to the resection site.
>
> **IMPRESSION:**
> 1. Post[-]op changes with swelling. Consider infection versus post[-]op swelling.

Doc. 73-1 at 78; see Lay Decl. at 8. Physical therapist John Palmer saw Daniels on July 17th, and recommended additional physical therapy. See Doc. 73-1 at 81; Lay Decl. at 8. That same day, a physician consulted with Daniels about his left-hand pain, recommended a follow-up with Dr. Ong in one to two weeks, and noted that Daniels was taking Excedrin for pain management. See Doc. 73-1 at 82; Lay Decl. at 8. On July 26th, Dr. Ong saw Daniels, prescribed Excedrin for another thirty days, and ordered a follow-up appointment. See Doc. 73-1 at 84; Lay Decl. at 8.

Dr. Lay states that Daniels injured his right hand in August of 2017, when he punched some glass. See Lay Decl. at 8. The FDOC transferred Daniels to the University of Florida Hospital for right-hand and arm surgery, and returned Daniels to his assigned correctional institution on August 10th, with instructions to follow-up with an orthopedic specialist about a prescription for pain medication. See id. Daniels had twenty-four sessions of left-hand physical therapy from August 24th through December 6th. See Doc. 73-1 at 86-97, 102-106; Lay Decl. at 8. Dr. Ong saw Daniels on November 1st and reported that Daniels was undergoing physical therapy twice a week and had completed

sixteen of twenty-four sessions. <u>See</u> Doc. 73-1 at 99; Lay Decl. at 8-9. At that time, Ong

ordered additional x-rays and a follow-up appointment. <u>See</u> Doc. 73-1 at 99; Lay Decl. at

9. The RMC medical staff took x-rays on November 1st, and Dr. Veigh reported the

following:

> HAND LT 3V:
> Comparison 7/7/17.
> Results:
> Study shows once again erosive changes to the PIP fifth digit.
> Soft tissue swelling noted. Consider underlying infection or
> other entity.
>
> IMPRESSION:
> 1. Stable hand. Erosion of the distal aspect proximal phalanx
> and the proximal aspect middle phalanx of the fifth digit.
> Associated soft tissue swelling noted.

Doc. 73-1 at 101; <u>see</u> Lay Decl. at 9. Daniels saw Dr. Ong for a December 20, 2017

appointment, at which Ong prescribed additional pain medication (Excedrin) for sixty

days, and ordered x-rays and a follow-up appointment. <u>See</u> Doc. 73-1 at 108; Lay Decl.

at 9. On January 17, 2018, Daniels saw Dr. J. Fabregas-Schindler, the on-site Medical

Director at Madison Correctional Institution, who ordered additional x-rays for forwarding

to an orthopedist for a specialty evaluation. <u>See</u> Doc. 73-1 at 110; Lay Decl. at 9. One

month later at a "Periodic Screening Encounter," Daniels commented, "I'm okay." Doc.

73-1 at 111; Lay Decl. at 9.

Given the evidence submitted by Defendants, the Court finds they have met their

initial burden of showing, by reference to Dr. Lay's declaration and the medical records,

that Defendants Vilchez, Vazquez, and Figueroa's conduct and Centurion's policies did

not violate Daniels' federal constitutional rights. Thus, Daniels is required to present

evidence to show that there is a genuine issue for trial. See Brennan v. Headley, No. 18-12309, 2020 WL 1320891, at *5 (11th Cir. March 20, 2020) (per curiam) ("But to survive a summary judgment motion, [Daniels] must point to the presence of disputed, material facts.") (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 607-08 (11th Cir. 1991)). This, Daniels has not done. If this case were to proceed to trial, Daniels would have only his testimony to support his claims, and his testimony does not refute Defendants' medical evidence. Indeed, the exhibits submitted by Defendants support their position that they performed their duties in such a manner that was not violative of Daniels' federal constitutional rights.

According to the medical records, Centurion and its medical providers (Drs. Figueroa, Vazquez, and Vilchez) provided timely and adequate medical care for Daniels' left-hand injury. They neither disregarded a risk of serious harm to Daniels' hand nor displayed conduct beyond mere negligence. Additionally, the medical records show that medical professionals, including Defendants Figueroa, Vazquez, and Vilchez, met Daniels' pain-management needs. Any "occasional gap in prescription coverage was merely negligent." Brennan, 2020 WL 1320891, at *7. To the extent Daniels complains about Defendants Figueroa, Vazquez, and Vilchez's course of treatment, such a complaint would be at most a claim of negligence or a disagreement with their medical treatment choice, neither of which would be sufficient to state a claim of deliberate indifference to a serious medical condition. See Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991). Nor has Daniels provided specific facts or medical evidence suggesting that any delay in the provision of medical care for his hand injury was unreasonable,

especially given that medical professionals closely monitored and evaluated him during the relevant time period. As to any complaints about unprofessional or negligent conduct by Defendants Figueroa, Vazquez, and Vilchez in providing allegedly substandard medical care, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham, 654 F.3d at 1176 (quotation marks and citation omitted). While Plaintiff's allegations may suggest medical malpractice, "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'" Harris v. Coweta Cty., 21 F.3d 388, 393 (11th Cir. 1994) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Consequently, any allegedly negligent conduct of which Daniels complains does not rise to the level of a federal constitutional violation and provides no basis for relief in this 42 U.S.C. § 1983 action. Additionally, any assertions against Nurse Crider or other Centurion medical providers fail because they are not named Defendants.

In the Complaint, Daniels asserts that Centurion "established a custom and usage" among its employees "to withhold medical care to inmates, other than routine and inexpensive health care, even if such health care was constitutionally mandated" under the Eighth Amendment. Complaint at 6. Defendants maintain that the medical evidence

"shows the absence of any such policies or customs because [Daniels] consistently received adequate and substantial medical care and treatment for his medical conditions." Motion at 20. Recently, the Eleventh Circuit affirmed a district court's granting of summary judgment in favor of a private entity that provides inmate medical services, stating:

> Corizon, as a private entity that contracts with the state to provide medical services to inmates, is treated as a municipality for purposes of § 1983 claims. See Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997) (per curiam). A municipality can be liable under § 1983 only where the alleged constitutional harm is the result of a custom or policy. Id. at 452-53. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality," and "[a] custom is a practice that is so settled and permanent that it takes on the force of law." Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (quotation marks omitted). "Demonstrating a policy or custom generally requires the plaintiff to show a persistent and wide-spread practice." Goodman v. Kimbrough, 718 F.3d 1325, 1335 (11th Cir. 2013) (quotation marks omitted).
>
> [Plaintiff] is correct that Corizon would be prohibited from adopting a policy to limit care in order to cut costs. See Hamm v. DeKalb County, 774 F.2d 1567, 1573-74 (11th Cir. 1985) (holding that state cannot completely deny medical care or provide care "below some minimally adequate level" to "limit[] the cost of detention"). But here, [Plaintiff] did not show that Corizon had a custom or policy of denying him adequate medical care. [Plaintiff] was unable to produce evidence beyond his own assertions of a "persistent and wide-spread practice" that Corizon used to deny him adequate medical care in order to cut costs. See Goodman, 718 F.3d at 1335. As a result, we affirm the judgment of the district court as to Corizon.

Brennan, 2020 WL 1320891, at *8. Here, Daniels has not produced evidence beyond his own assertions of a "persistent and wide-spread practice" that Centurion used to deny

him adequate medical care in order to cut costs. Goodman v. Kimbrough, 718 F.3d 1325, 1335 (11th Cir. 2013).

Defendants assert, and this Court agrees, that there remain no genuine issues of material fact. Daniels' conclusory assertions of inadequate medical treatment do not create a question of fact in the face of contradictory, contemporaneously created medical records. See Whitehead v. Burnside, 403 F. App'x 401, 403 (11th Cir. 2010) ("Although [Daniels] attempts to overcome summary judgment by offering his own sworn statement[s] ... to support his allegations, the contemporaneous medical records and opinions of the examining medical [professionals] show that this purported evidence is baseless."); see Scott v. Harris, 550 U.S. 372, 380 (2007) (where a party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). Given the strong and consistent medical records as well as Dr. Lay's declaration and Daniels' failure to provide any evidence other than his own beliefs, no reasonable jury could find for Daniels under these circumstances. See Goodman, 718 F.3d at 1332 (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient"). As such, Defendants' Motion is due to be granted as to Daniels' Eighth Amendment claims against them. Additionally, Daniels' request for summary judgment under Rule

56(f) is due to be denied.[20] The Court will also deny Daniels' request for additional time to respond to Defendants' Motion.[21]

In consideration of the foregoing, it is now

**ORDERED**:

1.      Defendants Centurion, Vilchez, Vazquez, and Figueroa's Motion for Summary Judgment (Doc. 73) is **GRANTED.**

2.      Daniels' request for summary judgment under Rule 56(f), see Response at 5, is **DENIED**.

3.      Daniels' request for additional time to respond to Defendants' Motion, see Response at 5, is **DENIED**.

4.      The Clerk shall enter judgment in favor of Defendants Centurion, Vilchez, Vazquez, and Figueroa, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 6th day of May, 2020.

MARCIA MORALES HOWARD
United States District Judge

sc 5/6
c:
Theron Daniels, FDOC #068947
Counsel of Record

---

[20] The Court notes that a request for affirmative relief is not properly made when simply included in a response to a motion. See Fed. R. Civ. P. 7(b); see also Rosenberg v. Gould, 554 F.3d 962, 965 (11th Cir. 2009) (quoting Posner v. Essex Ins. Co., 178 F.3d 1209, 1222 (11th Cir. 1999)).

[21] Daniels has had sufficient time to engage in discovery by the court-imposed deadline (December 16, 2019). See Orders (Docs. 62, 70).